**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>RONALD A. PLESE,<br><br>Debtor. | Bankruptcy Case No. 23-10992 TBM<br>Chapter 13 |

---

## MEMORANDUM OPINION AND ORDER ON CHAPTER 13 CONFIRMATION AND CONVERSION ISSUES

---

### I.    Introduction.

Chapter 13 of the Bankruptcy Code[1] "affords individuals receiving regular income an opportunity to obtain some relief from their debts while retaining their property." *Bullard v. Blue Hills Bank*, 575 U.S. 496, 498 (2015). The *quid pro quo* is a Chapter 13 plan. A debtor must propose and obtain Court approval of a "plan under which [the debtor] pay[s] creditors out of . . . future income." *Hamilton v. Lanning*, 560 U.S. 505, 508 (2010). Under Section 1325(b), if a Chapter 13 trustee or creditor objects to a Chapter 13 plan, then a debtor must either pay all claims in full or commit "all of the debtor's projected disposable income" to Chapter 13 plan payments over a period between three and five years. It is a very tough bargain — the vast majority of Chapter 13 cases fail.

In this bankruptcy proceeding, the Debtor, Ronald A. Plese (the "Debtor"), proposed a Chapter 13 plan. Chapter 13 Trustee Adam M. Goodman (the "Chapter 13 Trustee") objected. He asserted that the Chapter 13 plan was unconfirmable under Section 1325(a)(3) because the Debtor did not propose it in good faith. The Chapter 13 Trustee also argued the Chapter 13 plan failed the best interests of creditors test per Section 1325(a)(4). Both objections mainly were premised on an alleged pre-petition fraudulent transfer of real property by the Debtor to his son. The Debtor contested each of the objections.

Meanwhile, in addition to the confirmation objections, the Chapter 13 Trustee also requested reconversion of the Debtor's Chapter 13 reorganization case to a Chapter 7 liquidation under Section 1307(c)(1). The Chapter 13 Trustee relied on mostly the same issues raised with respect to his objections to the Chapter 13 plan and insisted that the case should be converted to Chapter 7 liquidation because a Chapter 7

---

[1]    All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

trustee would be in the best position to investigate and potentially prosecute a fraudulent transfer claim against the Debtor's son for recovery and liquidation of the alleged improper transfer of real property by the Debtor.  The Debtor objected to reconversion and insists on Chapter 13 reorganization.

The Court conducted a trial on the disputed issues.  After the trial, the Debtor filed two new amended Chapter 13 plans which effectively moot the pending confirmation issues.  But, the Chapter 13 Trustee still insists on reconversion to Chapter 7 liquidation.  For the reasons set forth below, the Court declines to reconvert the Debtor's bankruptcy case under Section 1307(c).  The Debtor may continue to pursue Chapter 13 confirmation.

## II.   Jurisdiction and Venue.

This Court has jurisdiction to enter final judgment on the issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334.  The plan confirmation and conversion dispute is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), (b)(2)(L) (confirmation of plans), and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.   Procedural Background.

The Debtor filed for relief under Chapter 7 of the Bankruptcy Code on March 16, 2023 (the "Petition Date").[2]  He listed his then-current address as: 1980 Carrol Court, Thornton, Colorado.[3]  In his Statement of Financial Affairs, he also noted that he had lived at 4480 East 109th Avenue, Thornton, Colorado (the "East 109th Avenue Property") from October 1, 1997 to July 1, 2021.[4]  Section 18 of the Statement of Financial Affairs asked the Debtor to answer the following question:

> Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?

The Debtor initially identified only that he transferred the East 109th Avenue Property to Vincente and Joyce Rodriguez on August 15, 2021 for "Proceeds $180,813."[5]

Shortly after the Petition Date, Tom H. Connolly was appointed as the Chapter 7 Trustee (the Chapter 7 Trustee").[6]  The Chapter 7 Trustee conducted a Section 341 meeting of creditors on April 12, 2023.[7]  A week later, on April 19, 2023, the Debtor

---

[2]     Docket No. 1; Ex. 1.
[3]     Docket No. 1 at 2; Ex. 1 at 2.
[4]     Docket No. 1 at 8; Ex. 1 at 8.
[5]     Docket No. 1 at 11; Ex. 1 at 11.
[6]     Docket No. 8.
[7]     Docket No. 8.

amended Section 18 of his Statement of Financial Affairs and identified an additional transfer of property.[8]  The Debtor stated that he transferred "Wyoming properties, [with a value of] $141,404" to his son, "Andrew Plese, 208 Railway Street, Hawk Springs, Wyoming" on September 15, 2022.[9]  The Debtor indicated that the property value ($141,404.00) was derived from the "assessed value per Goshen County Assessor."[10]  With respect to "any property or payments received or debts paid in exchange" for the transfer, the Debtor stated: "$0 (son paid for & lives at property)."[11]

On May 23, 2023, the Debtor filed a "Motion to Convert Chapter 7 to Chapter 13 Proceeding" (the "Motion to Convert"),[12] and stated:

> On or about April 10, 2020, Debtor's son, Andrew Plese ("Andrew"), paid the Debtor $5,000.00 for Debtor to purchase — on behalf of Andrew — certain real property located in Hawk Springs, WY.  On September 15, 2022, Debtor transferred said real property to his son via quit claim deed . . . .
>
> The circumstances surrounding the acquisition of the real property are confusing.  Andrew and the seller (i.e., Mr. Seymore) used Debtor as a conduit to obtain the property.  Andrew borrowed $5,000.00 from the Debtor to consummate the sale from Mr. Seymore.  Additional funds were exchanged between Andrew and Mr. Seymore — not the Debtor.  Andrew repaid the Debtor pre-petition.  There are no receipts for the funds used to purchase the property, except a receipt from Mr. Seymore for the $34,400.00 paid by Andrew.[13]

According to the Motion to Convert, the Debtor believed that the Chapter 7 Trustee might "file an action under Section 727 to deny the order of discharge and recover the clumsily transferred property from Andrew Plese."[14]  Although the Debtor indicated that he had defenses to any such action, he asserted that he "prefers . . . to repay all allowed unsecured creditors" through a Chapter 13 plan.[15]  So, the Debtor asked for Court authorization to convert to a Chapter 13 reorganization.

No creditor or other party in interest objected to the Motion to Convert.  On June 16, 2023, the Court entered an "Order Converting Case to Chapter 13."[16]  Shortly thereafter, the Debtor filed his initial "Chapter 13 Plan Including Valuation of Collateral

---

[8]     Docket No. 11; Ex. 4.
[9]     *Id.*
[10]    *Id.*
[11]    *Id.*
[12]    Docket No. 17; Ex. 17.
[13]    Docket No. 17 ¶¶ 5 and 8; Ex. 17 ¶¶ 5 and 8.
[14]    Docket No. 17 ¶ 9; Ex. 17 ¶ 9.
[15]    Docket No. 17 ¶¶ 10-11; Ex. 17 ¶¶ 10-11.
[16]    Docket No. 24.

and Classification of Claims" (the "First Chapter 13 Plan").[17]  The Chapter 13 Trustee objected to the First Chapter 13 Plan.[18]  The Debtor expressed his intention to amend the First Chapter 13 Plan.  Accordingly, the Court denied confirmation of the First Chapter 13 Plan.[19]  Thereafter, the Debtor filed an "Amended Chapter 13 Plan Including Valuation of Collateral and Classification of Claims" (the "Second Chapter 13 Plan").[20]  The Chapter 13 Trustee objected to the Second Chapter 13 Plan.[21]  At a hearing on the Second Chapter 13 Plan, the Debtor expressed his intention to amend the Second Chapter 13 Plan.  Accordingly, the Court denied confirmation of the Second Chapter 13 Plan.[22]  Thereafter, the Debtor filed an "Amended Chapter 13 Plan Including Valuation of Collateral and Classification of Claims" (the "Third Chapter 13 Plan").[23]  The Third Chapter 13 Plan proposed that the Debtor pay the Chapter 13 Trustee 36 monthly payments of $564.60 for a total of $20,325.60.  The Chapter 13 Trustee objected to the Third Chapter 13 Plan (the "Confirmation Objection").[24]  No other creditor or party in interest objected to the Third Chapter 13 Plan.

The Court set a trial on confirmation of the Third Chapter 13 Plan and the Confirmation Objection for February 21, 2024.[25]  Subsequently, the Chapter 13 Trustee filed a "Motion to Reconvert Case Pursuant to 11 U.S.C. § 1307(c)" (the "Reconversion Motion").[26]  Through the Reconversion Motion, the Chapter 13 Trustee requested that the case be reconverted to a Chapter 7 liquidation.  The Debtor objected to the Reconversion Motion (the "Reconversion Objection").[27]  Given the overlap of factual and legal issues as among the Third Chapter 13 Plan, the Confirmation Objection, the Reconversion Motion, and the Reconversion Objection, the Court directed that all issues be tried together.[28]  The Chapter 13 Trustee and the Debtor filed legal briefs on the issues set for trial.[29]  And, the parties submitted a "Statement of Stipulated Facts" (the "Stipulated Facts").[30]

On February 21, 2024, the Court conducted a trial on the Third Chapter 13 Plan, the Confirmation Objection, the Reconversion Motion, and the Reconversion Objection.[31]  Only one witness testified: the Debtor.  The Court admitted into evidence Debtor's Exhibits A, B, E, F, G, H, I, and J as well as the Chapter 13 Trustee's Exhibits 1, 2, 4-18 and 20-23.  The Court reserved ruling on the admission into evidence of the Debtor's Exhibit C.  During closing argument, the Debtor conceded that the Third Chapter 13 Plan was facially unconfirmable because of inconsistences in the term of the

---

[17]     Docket No. 28.
[18]     Docket No. 30.
[19]     Docket No. 32.
[20]     Docket No. 39.
[21]     Docket No. 48.
[22]     Docket No. 55.
[23]     Docket No. 57; Ex. 3.
[24]     Docket No. 63.
[25]     Docket No. 67.
[26]     Docket No. 70.
[27]     Docket No. 78.
[28]     Docket No. 67.
[29]     Docket Nos. 76 and 77.
[30]     Docket No. 80.
[31]     Docket No. 83.

Third Amended Plan.  Debtor's counsel also indicated that the Debtor intended to amend the Third Chapter 13 Plan to address some of the objections raised by the Chapter 13 Trustee.

At the conclusion of the trial, the Court took the various disputes under advisement.  Subsequently, the Debtor filed an ""Amended Chapter 13 Plan Including Valuation of Collateral and Classification of Claims" (the "Fourth Chapter 13 Plan")[32] thereby conceding that the Debtor no longer wished to prosecute the Third Chapter 13 Plan.  The Fourth Chapter 13 Plan proposes that the Debtor pay the Chapter 13 Trustee 36 monthly payments of $564.60 for a total of $20,325.60.  As a result of the Debtor filing the Fourth Chapter 13 Plan, the Court issued an Order determining that the Third Chapter 13 Plan "is mooted" by the filing of the Debtor's Fourth Chapter 13 Plan and therefore the Court denied the Third Chapter 13 Plan.[33]  The Court also established the procedure for the Debtor to prosecute the Fourth Chapter 13 Plan.[34]  Subsequently, the Chapter 13 Trustee objected to the Fourth Chapter 13 Plan.[35]  The Court conducted a hearing on the Fourth Chapter 13 Plan on March 20, 2024.[36]  During the hearing, the Court denied confirmation of the Fourth Chapter 13 Plan and granted the Debtor's request to further amend the Fourth Chapter 13 Plan.[37]  Thereafter, the Debtor filed an "Amended Chapter 13 Plan Including Valuation of Collateral and Classification of Claims" (the "Fifth Chapter 13 Plan").[38]  The Fifth Chapter 13 Plan is the operative reorganization plan being prosecuted by the Debtor.  The Fifth Chapter 13 Plan proposes that the Debtor pay the Chapter 13 Trustee 36 monthly payments of $564.60 for a total of $20,325.60.  The Chapter 13 Trustee objected to the Fifth Chapter 13 Plan mainly on the basis that the case should be converted to Chapter 7 liquidation per the Reconversion Motion.[39]

At this stage, the Reconversion Motion and Reconversion Objection are pending and ripe for decision.  Both the Chapter 13 Trustee and the Debtor have requested that the Court rule on the Reconversion Motion and the Reconversion Objection based upon the evidence presented at the trial.  However, the Fifth Chapter 13 Plan is not ripe for decision.  And, since the Court already has denied confirmation of the Third Chapter 13 Plan (which was pending as of the trial), there is no reason for the Court to further address the Third Chapter 13 Plan.

## IV.    **Findings of Fact**

Based upon the evidence presented at the trial and the Stipulated Facts, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.

---

[32]    Docket No. 85.
[33]    Docket No. 89.
[34]    *Id*.
[35]    Docket No. 94.
[36]    Docket No. 97.
[37]    *Id*.
[38]    Docket No. 99.
[39]    Docket No. 105.

A.      **The Debtor's Background and Employment.**

The Debtor is a middle-aged man.  He is a high school graduate who attended college for a few years but did not graduate.  In 1997, he began training to become an electrician.  Through tenacity, experience, and additional education, the Debtor passed the State of Colorado Electrical Examination and eventually became a Master Electrician.  He owns and manages his own company: Plese Electric LLC ("Plese Electric").  Plese Electric provides electrical services mainly for owners of private residences.  Notwithstanding his status as a Master Electrician, in recent years the Debtor has not achieved much financial success.  For example, on his Statement of Financial Affairs, the Debtor reported only very modest income in 2021 and 2022 from Plese Electric: $16,450.00 and $15,340.00, respectively.  Some of the Debtor's financial challenges stem from chronic health conditions.  He has Type II diabetes and has suffered other maladies.  Given the Debtor's bleak economic circumstances, he has moved in with his mother who owns a residence at 1980 Carrol Court, Thornton, Colorado.

B.      **The Debtor's Assets and Liabilities.**

1.      **Assets.**

The Debtor owns very little.  As of the Petition Date, he had household furnishings and goods valued at $900.00, $102.00 in financial accounts, clothes worth $150.00, a fishing pole and tackle valued at $75.00, a handgun worth $200.00, and $175.00 in tools.[40]  The Debtor owns all the membership interests in Plese Electric.  However, the entity appears to have no real value since it is insolvent and has "debts [of] approximately $718,037.00" as against some modest receivables.[41]  The Debtor's most significant asset is a 2017 Ford Explorer valued at $13,371.00 — but the vehicle is encumbered by a far larger outstanding loan.[42]  So, the Debtor has no equity in the Ford Explorer.

2.      **Liabilities.**

The Debtor's debt picture is not particularly complex.  Sixteen creditors filed proofs of claim against him.  Most of his obligations are for taxes and consumer debt.  Per the filed Proofs of Claim, he owes: (1) $31,783.93 on his car loan; (2) about $19,400.00 in taxes to the Internal Revenue Services and the Colorado Department of Revenue; and (3) around $6,800.00 for a combination of credit card and consumer debt.

But, two claims are quite substantial.  They both involve Plese Electric.  First, Hard Hat Contractors, LLC ("Hard Hat") filed Proof of Claim No. 11-1 for $718,037.25.  The Hard Hat claim is based upon an Arbitration Award entered on September 27, 2022 against Plese Electric for $718,037.25.  Per the Arbitration Award, the Arbitrator

---

[40]     Docket No. 1 at 16-20; Ex. 1 at 16-20.
[41]     *Id.*
[42]     Docket No. 1 at 16 and 23; Ex. 1 at 16 and 23.

expressly declined to award Hard Hat any damages against the Debtor personally.  The Arbitration Award was confirmed by the District Court for Douglas County, Colorado which entered Judgment in favor of Hard Hat and against Plese Electric (but not the Debtor).  The Debtor objected to the Hard Hat claim on the basis that the Debtor does not owe anything to Hard Hat.[43]  Hard Hat did not respond.  Thereafter, the Court disallowed Hard Hat's Proof of Claim No. 11-1.[44]  The second substantial claim is Proof of Claim No. 16-1 in the amount of $204,730.16 filed by Kokanee Investment LLC ("Kokanee Investments").  Kokanee Investments asserts that the "Debtor abandoned project after payment."  The Debtor objected to Kokanee Investments Proof of Claim No. 16-1 and Kokanee Investments responded.[45]  The Debtor testified that Kokanee Investments had a contract with Plese Electric (not him personally) and Kokanee Investments owes Plese Electric money.  The dispute is pending.

## C.   The Debtor's Income and Expenses.

As set forth above, the Debtor works as a Master Electrician through his entity Plese Electric.  The Debtor reported only very modest personal income in 2021 and 2022 from Plese Electric: $16,450.00 and $15,340.00, respectively.  According to his initial Schedules I and J, the Debtor made about $1,100.00 per month in income from operating a business, while having $2,728.00 in monthly expenses.[46]  Thereafter, the Debtor amended Schedules I and J three times.  In his first Amended Schedules I and J, the Debtor reported $2,470.00 per month in income from operating a business, while having $1,905.00.00 in monthly expenses thereby yielding monthly net income of $565.00.[47]  In his second Amended Schedules I and J, the Debtor reported $1,500.00 per month in income from operating a business, while having just $990.00 in monthly expenses thereby yielding monthly net income of $510.00.[48]  In his third Amended Schedules I and J, the Debtor reported $1,709.30 per month in income from operating a business, while having $1,145.00 in monthly expenses thereby yielding monthly net income of $564.30.[49]  The Debtor testified that all the various changes are corrections and updates.  He swore that he is now 'in the black" and can make required payments to the Chapter 13 Trustee.

Other evidence shows that the Debtor's income is highly variable depending on Plese Electric's jobs.[50]  Somehow, the Debtor is current on paying the Chapter 13 Trustee $564.60 per month (as proposed in the Third, Fourth and Fifth Chapter 13 Plans).  In order to make the payments to the Chapter 13 Trustee, and even before that for the last several years, the Debtor has engaged in draconian cost cutting.  He lives with his mother and only pays her some modest rent if he can.  If he is not able to pay his mother for rent, he performs house maintenance for her.  The Debtor has not

---

[43]     Docket No. 34.
[44]     Docket No. 51.
[45]     Docket Nos. 64 and 69.
[46]     Docket No. 1 at 33-37; Ex. 1 at 33-37.
[47]     Docket No. 43 at 1-5; Ex. 6 at 1-5.
[48]     Docket No. 59 at 6-10; Ex. 7 at 1-5.
[49]     Docket No. 102.
[50]     Exs. 10, G, H, I, and J.

purchased any new clothing in the last four years.  His last vacation was in approximately 2001.  Again, the Debtor is finding a way to pay the Chapter 13 Trustee to meet his bankruptcy obligations as proposed in the Third, Fourth, and Fifth Chapter 13 Plans.  The Court assesses that the Debtor is committed to satisfying his obligations in the Chapter 13 process.

**D.**   **Facts Pertaining to the Wyoming Property.**

  **1.**   **The Transfer of the Wyoming Property to the Debtor.**

On February 9, 2018, Wayne O. Birkley and Colleen A. Birkley executed a "Quitclaim Deed" (the "First Quitclaim Deed") transferring certain real property to the Debtor.  The First Quitclaim Deed states:

> Wayne O. Birkley and Colleen Birkley, husband and wife, Grantors, for the consideration of Ten Dollars ($10.00) and other good and valuable consideration, convey and quitclaims to Ronald Allen Plese, Grantee of _____, Goshen County, Wyoming, all interest they have in the following described real estate: Lots 20, 21, and 22, Block 5 Original Town of Hawk Springs, Goshen County, Wyoming . . . [51]

The real property described in the First Quitclaim Deed is more commonly known as 208 Railway Street, Hawk Springs, Wyoming.  Thus, the Court refers to the foregoing real property as the "Railway Street Property."  The First Quitclaim Deed was recorded in the real property records of Goshen County, Wyoming on February 9, 2018.[52]

Contemporaneously with the execution of the First Quitclaim Deed, on February 9, 2018, the Debtor executed a "Statement of Consideration" (the "First Statement of Consideration") reciting the consideration for the First Quitclaim Deed.  The Debtor stated (under oath) that the "Total amount paid or to be paid for the property [was] $25,000.00 . . . [in] Cash."[53]  The First Statement of Consideration was recorded in the real property records of Goshen County, Wyoming on February 9, 2018.[54]  The $25,000.00 used to buy the Railway Street Property came from the Debtor's son, Andrew Plese, not the Debtor.

A few years later, on May 15, 2020, Wayne O. Birkley and Colleen A. Birkley executed a "Quitclaim Deed" (the "Second Quitclaim Deed") transferring certain additional real property to the Debtor.  The Second Quitclaim Deed states:

> Wayne O. Birkley and Colleen A. Birkley, husband and wife, Grantors, for the consideration of Ten Dollars ($10.00) and

---

[51]   Ex. 18.
[52]   *Id.*
[53]   Ex. 19.
[54]   *Id.*

8

> other good and valuable consideration, convey and quitclaim to Ronald Allen Plese, Grantee, of 208 Railway Street, Hawk Springs, Wyoming, all interest they have in the following described real estate:
>
> Lots 1, 2, 3, 4, 5, 23, and 24 Block 5, Original Town of Hawk Springs, Goshen County, Wyoming
>
> and
>
> Lots 11, 12, 13, 14, 15, and 16, Block 3 Original Town of Hawk Springs, Goshen County, Wyoming . . . .[55]

The Court refers to the foregoing real property as the "Additional Property."  The Court also refers to the Railway Street Property together with the Additional Property as the "Wyoming Property."  The Second Quitclaim Deed was recorded in the real property records of Goshen County, Wyoming on May 15, 2020.[56]

Contemporaneously with the execution of the Second Quitclaim Deed, on May 15, 2020, the Debtor executed a "Statement of Consideration" (the "Second Statement of Consideration") reciting the consideration for the Second Quitclaim Deed.  The Debtor stated (under oath) that the "Total amount paid or to be paid for the property [was] $65,000.00 . . . [through] Promissory Note and Mortgage."[57]  The Second Statement of Consideration was recorded in the real property records of Goshen County, Wyoming on May 15, 2020.[58]

At the same time as the Second Quitclaim Deed, on May 15, 2020, the Debtor also executed a "Mortgage Deed with Release of Homestead" (the "Mortgage").[59]  The Mortgage Deed provides:

> Ronald Allen Plese, Mortgagor, to secure the repayment of . . . $65,000, with no interest, payable in monthly installments beginning May 15, 2020, evidenced by one (1) promissory note, of even date herewith, does hereby mortgage to Wayne O. Birkley and Colleen A. Birkley, husband and wife, Mortgagees . . . the following described real estate, situated in the County of Goshen, State of Wyoming, to-wit:
>
> Lots 1, 2, 3, 4, 5, 23, and 24 Block 5, Original Town of Hawk Springs, Goshen County, Wyoming
>
> and

---

[55]   Ex. 20.
[56]   *Id.*
[57]   Ex. 21.
[58]   *Id.*
[59]   Ex. 22.

> Lots 11, 12, 13, 14, 15, and 16, Block 3, Hawk Springs, Goshen County, Wyoming . . . .
>
> The property encumbered by this mortgage may not be assigned, sold or transferred in any manner without the written consent of the Mortgagees.
>
> The Mortgagor agrees to pay the indebtedness hereby secured, and to pay all taxes and assessments on said premises and to keep the buildings thereon insured in a sum not less than $65,000.00 during the life of this mortgage . . . .[60]

The Mortgage was recorded in the real property records of Goshen County, Wyoming on May 15, 2020.[61]  The Court did receive into evidence the "promissory note" referenced in the Mortgage.

### 2.      The Transfer of the Wyoming Property to the Debtor's Son.

On September 15, 2022, the Debtor executed a "Quitclaim Deed" (the "Transfer Deed") pursuant to which the Debtor stated:

> For valuable consideration of $10.00, and other good and valuable consideration . . . Ronald Allen Plese, not married, of 208 Railway St., Hawk Springs, WY 82217, USA (the "Grantor") does hereby convey, as well as quitclaim, unto Andrew Allen Plese, not married, of 208 Railway St., Hawk Springs, WY 82217, USA (the "Grantee") as the sole tenant, the following lands and property, together with all improvements attached to the property, lying in the County of Goshen, State of Wyoming:  Hawk springs Original town BLK 05 Lot 1-2-3-4-5-23-24 BLK 03 Lot 11-12-13-14-15-16 BLK 5 lot 20, 21, 22 . . . .[62]

The real property described in the Transfer Deed is the entire Wyoming Property.  The Transfer Deed was recorded in the real property records of Goshen County, Wyoming on September 15, 2022.[63]  So, whatever the Debtor's interest in the Wyoming Property was, if any, he transferred it to his son.

---

[60]    *Id.*
[61]    *Id.*
[62]    Ex. E.
[63]    *Id.*

### 3.   <u>Other Facts Regarding the Transfer of the Wyoming Property</u>.

Although the foregoing facts specify the record transfers of the Wyoming Property from 2018 to 2022, there is more to the story.  According to the Debtor, his friend, Darren Seymore, lived near the Wyoming Property.  The Debtor and his son, Andrew Plese, visited Darren Seymore from time to time.  As a result, the Debtor's son decided to buy land and move to the area.  In 2018, Darren Seymore introduced the Debtor (and possibly his son) to one of the then-owners of the Wyoming Property: Wayne O. Birkley.  Mr. Birkley offered the Wyoming Property to the Debtor or his son for $90,000.00.  The Debtor's son could not afford the purchase price.  So, Mr. Birkley offered to sell the Wyoming Property in two separate parcels: the Railway Street Property and the Additional Property which are contiguous.

After explaining the foregoing, the Debtor's testimony became notably unclear and confusing.  The Debtor testified that he needed to be involved in the Wyoming Property transactions as some sort of middleman or conduit to assist his son in borrowing some of the purchase price from Darren Seymour (the Debtor's close friend) since his son did not have enough funds to buy the Wyoming Property.  As set forth above, the First Quitclaim Deed for the Railway Street Property was executed on February 9, 2018 in return for $25,000.00.  According to the Debtor's testimony at trial, his son paid the entire $25,000.00.  If so, the Court has no idea why the Railway Street Property was transferred to the Debtor, not his son, through the First Quitclaim Deed.

With respect to transfer of the Additional Property on May 15, 2020 (for $65,000.00), the Debtor testified that Darren Seymore loaned Andrew Plese $34,000.00 to assist in the purchase.  Apparently, Andrew Plese also expected to receive some money from a tax refund and settlement of litigation concerning a car accident.  According to the Debtor, he did not fund or loan any money for the purchase of the Additional Property.  But, according to the Debtor, Darren Seymore wanted the Debtor to become the owner of the Additional Property so the Debtor could transfer the Additional Property to Darren Seymore if Andrew Plese did not pay off the loan from Darren Seymore.  None of this makes much sense.  And the Debtor's testimony at trial is contradicted by his prior representations to the Court.  For example, (as noted earlier) in the Motion to Convert, the Debt stated:

> On or about April 10, 2020, Debtor's son, Andrew Plese ("Andrew"), paid the Debtor $5,000.00 for Debtor to purchase — on behalf of Andrew — certain real property located in Hawk Springs, WY.  On September 15, 2022, Debtor transferred said real property to his son via quit claim deed . . . .
>
> The circumstances surrounding the acquisition of the real property are confusing.  Andrew and the seller (i.e., Mr. Seymore) used Debtor as a conduit to obtain the property.  Andrew borrowed $5,000.00 from the Debtor to consummate the sale from Mr. Seymore.  Additional funds were

exchanged between Andrew and Mr. Seymore — not the Debtor. Andrew repaid the Debtor pre-petition. There are no receipts for the funds used to purchase the property, except a receipt from Mr. Seymore for the $34,400.00 paid by Andrew.[64]

Most of the foregoing is demonstrably false and internally contradictory. Notably, the seller of the Additional Property was not "Mr. Seymore" — it was Wayne O. Birkley and Colleen A. Birkley. The Motion to Convert suggests that Andrew Plese "paid the Debtor $5,000.00" and then "Andrew borrowed $5,000.00 from the Debtor," and finally "Andrew repaid the Debtor pre-petition." Something is very wrong. And then, to make it all more confusing, "[t]here are no receipts for the funds used to purchase the property, except a receipt from Mr. Seymore for the $34,000.00 paid by Andrew." So, supposedly Andrew paid $34,000.00 to purchase the Additional Property instead of Mr. Seymore loaning $34,000.00." What of the remaining $31,000.00 of the purchase price for the Additional Property? The Court does not know. And none of the foregoing squares with the Mortgage Deed which states that the Debtor (not Andrew Plese) borrowed $65,000.00 from Wayne O. Birkley and Colleen A. Birkley.

There is some more odd evidence about the foregoing Wyoming Property transactions. At trial, the Debtor asked for the Court to admit into evidence Exhibit C which is a letter pertaining to a $34,400.00 loan (the "Loan Letter"). The Loan Letter states:

> I Darren Seymore am lending Andrew Plese $34,400.00. To help with the purchase of house and properties for Andrew Plese. House and properties are located at 208 railway street and 126 railway street in Hawksprings, Wyoming BLK 05 LOT 1-2-3-4-5-20-21-22-23-24, BLK 03 LOT 11-12-13-14-15-16. Ronald Plese will be a co-signer holding deeds in his name until Andrew Plese pays back all money owed. In the event Andrew Plese does not pay in full the money borrowed by January 1, 2023. Then Darren Seymore is entitled to receive deeds to house and properties signed over by Ronald Plese to Darren Seymore as payment in full. After Andrew Plese pays in full all money owed deeds will then be transfer to Andrew Plese from Ronald Plese. Date 2-07-2018.

The Loan Letter was signed by Darren Seymore, Andrew Plese, and the Debtor. Toward the bottom of the letter is a notation "Paid in full 8-1-2022" also signed by Darren Seymore, Andrew Plese, and the Debtor.[65] The Loan Letter is strange because

---

[64]   Docket No. 17 ¶¶ 5 and 8; Ex. 17 ¶¶ 5 and 8.

[65]   The Chapter 13 Trustee objected to the admission into evidence of Exhibit C on the basis of lack of foundation and hearsay. The Court reserved judgment on the admissibility of Exhibit C and now admits the Loan Letter. The Court overrules the lack of foundation objection because the Debtor testified that he was familiar with the Loan Letter and signed it. *See* F.R.E. 901(a) and (b)(1). Although a close

it is dated February 7, 2018, which is just days before the First Quitclaim Deed for the Railway Street Property.  But, per the Debtor's testimony, Andrew Plese already had the $25,000.00 for purchase of the Railway Street Property.  And, the Loan Letter does not seem to mesh with the Mortgage Deed which shows that the Debtor borrowed $65,000.00 from Wayne O. Birkley and Colleen A. Birkley.  On the other hand, after the "Paid in Full" notation on the Loan Letter, the Debtor issued the Transfer Deed which is consistent with the Loan Letter.

What to make of all this?  Who knows?  The quality and quantity of evidence presented by the Debtor and the Chapter 13 Trustee is insufficient for the Court to ascertain whether the Transfer Deed, issued on September 15, 2022 transferring the Wyoming Property from the Debtor to the Debtor's son, may be avoided as a fraudulent transfer as the Chapter 13 Trustee suggests.  The Court received no testimony from many of the key players: Wayne O. Birkley, Colleen A. Birkley, Andrew Plese, and Darren Seymore.  The Court received no documentary evidence of any payments to anyone pertaining to the Wyoming Property.  So, the Court finds that the most that can be said is that the Debtor's execution of the Transfer Deed possibly might be avoided as a fraudulent transfer, or possibly not.

### 4.    Other Facts Regarding the Wyoming Property.

The Debtor and his son are both listed as the "Insured" on the State Farm and Casualty Company insurance policy for the Railway Street Property.[66]  The Debtor also listed his address as the Railway Street Property on the following documents: (1) the Debtor's Wyoming Driver License (issued May 15, 2020);[67] (2) a property insurance policy for the Railway Street Property (issued for the period February 9, 2023 to February 9, 2024);[68] (3) a contract to buy a 2007 Hummer vehicle (dated September 6,

---

call, the Court also overrules the hearsay objection because the Debtor asserted a hearsay exception under F.R.E. 803(15) which states:

> Statements in Documents That Affect an Interest in Property.  A statement contained in a document that purports to establish or affect an interest in property if the matter stated was relevant to the document's purpose — unless later dealings with the property are inconsistent with the truth of the statement or the purport of the document.

"The requirements for admissibility under Rule 803(15) are that the document is authenticated and trustworthy, that it affects an interest in property, and that the dealings with the property since the document was made have been consistent with the statement." *Silverstein v. Chase*, 260 F.3d 142, 149 (2d Cir. 2001); *see also U.S. v. Boulware*, 384 F.3d 794, 807 (9th Cir. 2004) (same). Exhibit C satisfies the F.R.E. 803(15) requirements because it has been authenticated by the Debtor, purports to establish or affect an interest in property (*i.e.* entitlement to "receive deeds"), and is consistent with subsequent dealings (*i.e.*, after the Loan Letter was marked "paid in Full," the Debtor executed the Transfer Deed as contemplated in the Loan Letter).  *See McCoy v. Norfolk S. Ry. Co.*, 2013 WL 12250463, at *2 n.2  (D. S.D. W.Va. Jul. 8, 2013) (admitting letter about easement under F.R.E. 803(15)); *Embs v. Jordan Outdoor Enter., Ltd.*, 2005 WL 2250681, at *4 (S.D. Ohio. Sept. 15, 2005) (admitting written patent assignments under F.R.E. 803(15)).

66      Ex. 23.
67      Ex. 16.
68      Ex. 23.

2019);[69] (4) a contract to buy a 2015 Ford Super Duty truck (dated December 14, 2020);[70] (5) a contract to buy a 2017 Ford Explorer vehicle (dated August 16, 2021);[71] (6) the Second Quitclaim Deed;[72] (7) the Second Statement of Consideration;[73] (8) the Transfer Deed;[74] (9) the Debtor's 2022 U.S. Individual Income Tax Return;[75] and (10) the Debtor's 2022 State of Colorado Income Tax Return (wherein the Debtor stated that he was a "part-year or nonresident" of Colorado).[76]  Furthermore, the Debtor listed a post office box in Hawk Springs, Wyoming (the location of the Wyoming Property) as his address on his principal bank accounts.[77]  The Goshen County Treasurer and Assessor sent tax bills and assessments to the Debtor at the Railway Street Property in 2022 and 2023.[78]  The Debtor testified that Andrew Plese, (not the Debtor) paid for all real property taxes on the Wyoming Property.  And, notwithstanding all of the foregoing, the Debtor swore that he has not resided at the Wyoming Property except temporarily while visiting.  Instead, he swore that he lives in Thornton, Colorado.

## V.   Conclusions of Law

### A.   General Statutory Framework and Burden of Proof.

In the Reconversion Motion, the Chapter 13 Trustee contends the Debtor's Chapter 13 reorganization should be converted to a Chapter 7 liquidation pursuant to Section 1307(c).  Section 1307(c) provides for conversion or dismissal of a Chapter 13 case "for cause" and states:

> . . . on request of a party in interest . . . and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . .

The balance of Section 1307(c) contains a list of eleven enumerated "cause[s]".  The most frequently cited enumerated causes for conversion or dismissal include:

(1)   unreasonable delay by the debtor that is prejudicial to creditors;

(2)   nonpayment of any fees and charges required under chapter 123 of title 28;

---

[69]   Ex. 13.
[70]   Ex. 14.
[71]   Ex. 15
[72]   Ex. 20.
[73]   Ex. 21.
[74]   Ex. 24.
[75]   Ex. 8.
[76]   Ex. 9.
[77]   Exs. 11 and 12; Exs. F, G, H, I, and J.
[78]   Exs. A and B.

(3)     failure to file a plan timely under section 1321 of this title;

(4)     failure to commence making timely payments under section 1326 of this title;

(5)     denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan;

(6)     material default by the debtor with respect to a term of a confirmed plan

. . . .

The causes expressly enumerated in Section 1307(c) are not exclusive. *Alexander v. Hardeman (In re Alexander)*, 363 B.R. 917, 925 (10th Cir. BAP 2007) ("cause" under Section 1307(c) "is further defined though a non-exclusive list of eleven factors"). Instead, the Court also may convert or dismiss a Chapter 13 case for other causes not set forth in the statutory text.

Although unenumerated in the statute, a debtor's lack of good faith in filing its bankruptcy petition may serve as "cause" for dismissal under Section 1307(c). *Gier v. Farmers State Bank of Lucas, Kansas (In re Gier)*, 986 F.2d 1326, 1329-30 (10th Cir. 1993); *Armstrong v. Rushton (In re Armstrong)*, 303 B.R. 213, 221 (10th Cir. BAP 2004) ("The examples of cause listed in this subsection [1307(c)] are not exclusive, and good faith inquiries have traditionally been encompassed by § 1307(c)."); *Sullivan v. Solimini (In re Sullivan),* 326 B.R. 204, 211 (1st Cir. BAP 2005) ("it is well established that lack of good faith (or bad faith) is 'cause' for dismissal or conversion of a Chapter 13 case under § 1307(c).").

The party requesting relief under Section 1307(c) bears the burden of proving cause (whether enumerated or unenumerated) for conversion or dismissal. *Alt v. U.S. (In re Alt),* 305 F.3d 413, 420 (6th Cir. 2002) ("In the context of Section 1307(c), the burden of showing the debtor's lack of good faith is borne by the party seeking dismissal."); *In re Love,* 957 F.2d 1350, 1355 (7th Cir. 1992) ("party moving for dismissal [under Section 1307(c)] must demonstrate cause"; stating that burden of showing good faith is not on debtor because unlike Section 1325(a)(3), Section 1307(c) "does not specifically require that a debtor file a petition in good faith"); *Sullivan,* 326 B.R. at 211 ("[U]nder § 1307(c), the objecting creditor has the burden of proof, while under § 1325(a)(3), it is the debtor's burden."); *In re McDonald*, 508 B.R. 187, 205 (Bankr. D. Colo. 2014) (creditor "bears the burden of proof on whether Debtors filed their Conversion Motion in good faith."); *In re McDonald*, 2013 WL 1969266, at *4 (Bankr. D. Colo. May 13, 2013) ("a party seeking dismissal or conversion of a Chapter 13 case for "cause" under § 1307(c) has the burden of showing the debtor's lack of good faith based on the totality of the circumstances"); *In re Werts,* 410 B.R. 677, 690 (Bankr. D. Kan. 2009) ("the burden of showing that a case was filed in bad faith so as to require conversion or dismissal under § 1307(c) falls on the party seeking such

15

conversion or dismissal.").  If cause is proven, then the Court must determine whether conversion or dismissal is "in the best interests of creditors and the estate."  11 U.S.C. § 1307(c).

**B.**     **The Chapter 13 Trustee Failed to Establish Cause for Conversion to Chapter 7 Liquidation.**

In the Reconversion Motion, the Chapter 13 Trustee contends that Debtor's bankruptcy case was filed in bad faith and the "conversion to Chapter 13 is a manipulation of the Bankruptcy Code, results in an unreasonable delay that is prejudicial to creditors, and establishes cause for reconversion to Chapter 7."[79]  The central focus of the Reconversion Motion is the Transfer Deed whereby the Debtor transferred whatever property interest he had in the Wyoming Property to his son shortly before he filed for bankruptcy protection.  The Chapter 13 Trustee contends:

> Through conversion, Debtor seeks to circumvent the Chapter 7 Trustee's inquiry into the transfer of the Wyoming Properties to his son.  If the Chapter 7 Trustee was successful in avoiding the pre-petition transfer of the Wyoming Properties, it would result in a dividend to Class Four of approximately $116,770.00 based on the Debtor's valuation.  Debtor does not have the disposable income to pay this amount to his creditors, and Debtor cannot satisfy the requirements of § 1325(a)(4) by unilaterally inserting a nonstandard provision in Part 12 of the Plan.

> Further, conversion to Chapter 13 has caused an unreasonable delay that is prejudicial to creditors . . . .  Were this case to be reconverted to Chapter 7, one of two scenarios would likely take place: (1) the Chapter 7 Trustee is successful in avoiding the transfer of the Wyoming Properties, he sells them, pays unsecured creditors from the sale proceeds and Debtor receives his discharge; or (2) the Chapter 7 Trustee decides not to pursue the transfer of the Wyoming Properties, or is unsuccessful in his avoidance action, and Debtor receives a discharge of his unsecured debt.  Even if the Chapter 13 Trustee pursued the transfer of the Wyoming Properties and prevailed, he does not possess the authority to liquidate the real property, and reconversion to Chapter 7 would be necessary.[80]

As an initial matter, the Reconversion Motion appears premised on the idea that the Chapter 13 Trustee cannot pursue avoidance actions in Chapter 13 cases.  The Court rejects the premise.  The key local precedent on the topic is *In re Loeffler*, 2011

---

[79]     Docket No. 70 ¶ 22.
[80]     Docket No. 70 ¶¶ 25 and 26.

WL 6736066 (Bankr. D. Colo. Dec. 21, 2011).  In *Loeffler*, the Chapter 13 trustee objected to confirmation of a Chapter 13 plan on the basis of Section 1325(a)(4) arguing that the debtor must personally fund payment of the hypothetical value of a potential avoidance action recovery.  The *Loeffler* court disagreed and ruled as follows regarding avoidance actions (such as potential fraudulent transfers) in Chapter 13 cases:

> . . . avoidance actions are not under the control of the [Chapter 13] debtor.  It is the trustee who chooses to pursue an avoidance action.  That does not mean that a creditor in a chapter 13 proceeding should not expect to receive a distribution on account of assets that may be subject to recovery under §§ 544, 547 or 548.  But, because a chapter 13 debtor has no control over such recovery actions, the creditor must look to the chapter 13 trustee to recover and distribute those assets exactly as it must look to the trustee to pursue those recovery actions in a chapter 7 case.  So long as the Debtor's plan provides for that eventuality and provides that any such recovery must be distributed to creditors under the Plan, it passes muster under § 1325(a)(4).  *See, e.g., In re Johnson*, 26 B.R. 381, 383 (Bankr. D. Colo. 1982) ("Since the Chapter 13 trustee has the power to avoid the transfer . . . under 11 U.S.C. § 548, a plan providing for such event would satisfy the best interests test of Section 1325(a)(4)").

*Id*. at *3.

So, if the Chapter 13 Trustee believes that there is a strong claim for avoidance of the Transfer Deed as a fraudulent transfer, the Chapter 13 Trustee may prosecute such claim.  It is not within the Debtor's purview and the Debtor is not engaging in "unreasonable delay that is prejudicial to creditors" by not pursuing such claim.  Again, the Debtor cannot do so; but the Chapter 13 Trustee can.  Furthermore, in Part 12 of the Third, Fourth, and Fifth Chapter 13 Plans, the Debtor identified the transfer of the Wyoming Property to his son, clarified that the Chapter 13 Trustee may be able to pursue a fraudulent transfer action pertaining to the Transfer Deed, and proposed that if the Chapter 13 Trustee prevails, the proceeds recovered may be distributed to creditors.  Nothing more is necessary.  The Chapter 13 Trustee's preference that a Chapter 7 trustee prosecute any potential fraudulent transfer action about the Wyoming Property rather than the Chapter 13 Trustee does not support reconversion to Chapter 7 liquidation.

Moving on, the remaining thrust of the Reconversion Motion is that the Debtor is engaged in some sort of bad faith (pertaining to the Wyoming Property and the potential fraudulent transfer) which justifies reconversion to Chapter 7 per Section 1307(c).  As noted above, a debtor's lack of good faith in filing his bankruptcy petition may serve as "cause" for dismissal under Section 1307(c).  *Gier*, 986 F.2d at 1329-30; *Love*, 957 F.2d at 1355; *Armstrong,* 303 B.R. at 221; *Sullivan*, 326 B.R. at 211.

17

In determining whether a petition has been filed in bad faith under Section 1307(c), a bankruptcy court must consider the "totality of the circumstances" — an inquiry similar to evaluating whether a Chapter 13 plan has been filed in good faith under Section 1325(a)(3). *Gier*, 986 F.2d at 1329. Such approach "is as appropriate for a § 1307(c) inquiry as it is for a § 1325(a)(3) inquiry because in each case it best assists the bankruptcy court's determination [as to] 'whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [Chapter 13].'" *Id.* (quoting *Love*, 957 F.2d at 1357). The Tenth Circuit endorsed the following nonexhaustive set of factors for bankruptcy courts to consider in making Section 1307(c) determinations:

> [1] the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; [2] the timing of the petition; [3] how the debt arose; [4] the debtor's motive in filing the petition; [5] how the debtor's actions affected creditors; [5] the debtor's treatment of creditors both before and after the petition was filed; and [6] whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Id.* at 1329 (citing *Love*, 957 F.2d at 1357). Not all factors are applicable in every case. And, notwithstanding the factors, the overall governing framework remains the "totality of the circumstances."

The Tenth Circuit has employed slightly different tests for considering bad faith (or the lack of good faith) in the Chapter 13 confirmation process. As set forth above, unequivocally, the *Gier* factors govern determinations of bad faith when a motion to dismiss or convert a case is brought under Section 1307(c). However, the Tenth Circuit adopted a list of eleven factors (many similar and overlapping) to be considered during the confirmation process in evaluating whether a Chapter 13 "plan has been proposed in good faith" under Section 1325(a)(3). *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir. 1983). The *Flygare* factors are:

> (1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) the motivation and

sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee.

*Id.* at 1347-48 (quoting *U.S. v. Estus (In re Estus)*, 695 F.2d 311, 317 (8th Cir. 1982)); *see also Mason v. Young (In re Young)*, 237 F.3d 1168, 1174-75 (10th Cir. 2001) (reconfirming *Flygare* factors for Section 1325(a) good faith evaluation); *Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 (10th Cir. 1993) (same); *Pioneer Bank v. Rasmussen (In re Rasmussen)*, 888 F.2d 703, 704 (10th Cir. 1989) (same). The *Flygare* list is "not exhaustive, and the weight given each factor will necessarily vary with the facts and circumstances of each case." *Flygare*, 709 F.2d at 1348.

The *Flygare* decision pre-dates changes to the Bankruptcy Code — including to Sections 1325(b)(1) and (2) — made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA"). However, even post-BAPCPA, the Tenth Circuit confirmed the vitality of *Flygare*. The key post-BAPCPA decision is *Anderson v. Cranmer (In re Cranmer)*, 697 F.3d 1314 (10th Cir. 2012), in which the appellate panel endorsed the *Flygare* factors and instructed:

> The good faith determination is made on a case-by-case basis considering the totality of the circumstances. *Flygare v. Boulden*, 709 F.2d 1344, 1347 (10th Cir. 1983). In evaluating a debtor's good faith, courts should consider eleven non-exclusive factors [from *Flygare]* as well as any other relevant circumstances.

*Cranmer*, 697 F.2d at 1318-19. However, after listing the *Flygare* factors, the Tenth Circuit recognized a "more narrow focus" post-BAPCPA in relation to "ability to pay." The appellate court stated:

> Since *Flygare* was decided, however, the Bankruptcy Code was amended to include 11 U.S.C. § 1325(b). . . .  Section 1325(b)'s "'ability to pay' criteria subsumes most of the *Estus* factors" and, therefore, the good faith inquiry now "has a more narrow focus." . . .  A bankruptcy court must consider "factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code."

*Cranmer*, 697 F.3d at 1319 n.5 (internal citations omitted).

In the Reconversion Motion, the Chapter 13 Trustee referenced *Flygare*, 709 F.2d 1344.[81]  However, since the Court is not now adjudicating confirmation of the Fifth

---

[81]      Docket No. 70 ¶ 19

Chapter 13 Plan, the Court need not consider all the *Flygare* and *Cranmer* factors at this time.  Instead, as noted above, binding appellate precedent counsels that the Court should consider the seven *Gier* factors under Section 1307(c).  And, besides, the *Flygare* and *Cranmer* factors substantially overlap with the *Gier* factors.

### 1.   Nature of the Debts, How the Debts Arose, and Whether the Debts Would Be Nondischargeable in Chapter 7.

The first and third *Gier* factors are "the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding" and "how the debt arose."  *Gier*, 986 F.2d at 1329.  These *Gier* factors generally are most relevant when a creditor with a specific debt seeks dismissal or conversion under Section 1307(c).  However, in this dispute, no creditor has complained regarding the treatment of its debt and asked for dismissal or conversion.  Instead, the Chapter 13 Trustee filed the Reconversion Motion.

So, in the absence of disputes over specific debt, the Court considers the overall debt picture.  Most of the Debtor's obligations are for taxes and consumer debt.  Per the filed Proofs of Claim, he owes: (1) $31,783.93 on his car loan; (2) about $19,400.00 in taxes to the Internal Revenue Services and the Colorado Department of Revenue; and (3) around $6,800.00 for a combination of credit card and consumer debt.  Additionally, Hard Hat filed Proof of Claim No. 11-1 for $718,037.25; however, the Court already disallowed Proof of Claim No. 11-1.[82]  Kokanee Investments filed the only other significant claim: Proof of Claim No. 16-1 in the amount of $204,730.16 based upon allegedly incomplete work performed by Plese Electric.  The Debtor objected to Kokanee Investments Proof of Claim No. 16-1 as invalid because the Debtor contends the business relationship between Kokanee Investments and Plese Electric did not result in personal liability of the Debtor.[83]  The Debtor argued that he does not owe anything to Kokanee Investments.  Such dispute is pending.

The nature of the foregoing debts and how they arose does not suggest that the Debtor's Chapter 13 reorganization should be reconverted to Chapter 7.  Instead, the Debtor's bankruptcy case is a routine case from a debt perspective.  And, the Chapter 13 Trustee has not asserted that any of the debts would be dischargeable in Chapter 13 but not in Chapter 7.  There has not been any attempt by the Debtor to manipulate the bankruptcy process by using Chapter 13 to obtain a more favorable discharge scenario.  Thus, the first and third *Gier* factors do not support reconversion to Chapter 7.

### 2.   The Timing of the Petition and the Debtor's Motive in Filing the Petition.

The second and fourth *Gier* factors are "the timing of the petition" and "the debtor's motive in filing the petition."  The Debtor filed for bankruptcy relief under Chapter 7 on March 16, 2023.  Then, in the absence of any objections, the Court

---

82      Docket No. 51.
83      Docket No. 64.

converted the case from Chapter 7 liquidation to Chapter 13 reorganization on June 16, 2023. The Chapter 13 Trustee has not identified anything particularly notable about the Petition Date or the Debtor's motive for filing bankruptcy protection. The Petition Date was about two months after the District Court for Douglas County, Colorado confirmed a $718,037.25 Arbitration Award in favor of Hard Hat and against Plese Electric. Notwithstanding that the Arbitration Award was not entered against the Debtor personally, the Court infers that Hard Hat was attempting to collect against the Debtor. After all, Hard Hat filed Proof of Claim No. 11-1 against the Debtor. Similarly, the business relationship between Kokanee Investments and Plese Electric deteriorated in 2022 and early 2023. Nothing about the timing of filing for bankruptcy protection on March 16, 2023 appears out of the ordinary. Instead, the bankruptcy petition appears to have stemmed from two creditors pursuing the Debtor for debts which the Debtor contends he does not owe and could not pay.

Although the second and fourth *Gier* factors are "the timing of the petition" and "the debtor's motive in filing the petition," the Chapter 13 Trustee seems to be inviting the Court to consider the timing and the Debtor's motive for the conversion from Chapter 7 liquidation to Chapter 13 reorganization on June 16, 2023. No creditor or party in interest objected to the conversion from Chapter 7 to Chapter 13. And, the Debtor explained his rationale for conversion in the Motion to Convert and through his testimony at trial. Having disclosed to the Chapter 7 trustee and his creditors the transfer of the Wyoming Property to his son, the Debtor assessed that the Chapter 7 trustee (egged on by Hard Hat), likely would commence a fraudulent transfer action against his son. The Debtor believed that he held only "bare legal title" to the Wyoming Property when he executed the Transfer Deed. After all, according to the Debtor, he himself did not pay anything for the Wyoming Property. Nevertheless, the Debtor did not have "the resources and stamina" to assist his son in defending any fraudulent transfer claim and did not want to interrupt his son's life. Accordingly, he filed the Motion to Convert to pay his creditors (in full or in part) through a Chapter 13 reorganization. Based upon the Court's assessment, the Debtor's rationale does not suggest bad faith in moving to convert his case to Chapter 13. Perhaps even the opposite. In his Third, Fourth, and Fifth Chapter 13 Plans, the Debtor is proposing to pay creditors 36 monthly payments of $564.60 for a total of $20,325.60. Such amount would not pay all creditors in full. But, if Kokanee Investments Proof of Claim No. 16-1 is disallowed and the Debtor's Fifth Chapter 13 Plan is confirmed, then unsecured creditors likely would receive a very high pro rata percentage repayment of debt. Furthermore, in Chapter 13, the Chapter 13 Trustee may also prosecute a fraudulent transfer action against the Debtor's son if factually and legally warranted. In fact, the Debtor's Third, Fourth, and Fifth Chapter 13 Plans all contemplate the possibility of such action (even recognizing that the Debtor's significant repayment to creditors through the Chapter 13 process may ameliorate the economic rationale for such avoidance action). *Loeffler*, 2011 WL 6736066. In any event, the Debtor's creditors may be better off through the Debtor's reorganization proposals. If the case is reconverted to Chapter 7 liquidation, creditors will not receive the proposed $20,325.60 in payments from the Debtor. Instead, the only way creditors would receive any recovery in Chapter 7 would be if the Chapter 7 trustee prosecuted an avoidance action against the Debtor's son, won, and recovered funds to distribute. Based upon the confusing evidence at trial, the

Court cannot determine whether such action would be successful or not.  So, there is a very real chance that Chapter 13 reorganization will be best for creditors (especially so since the Chapter 13 Trustee also can prosecute the same type of uncertain fraudulent transfer claim that a Chapter 7 trustee might pursue).  Under these circumstances, the Chapter 13 Trustee has not proven that the timing and motive of the Debtor's conversion from Chapter 7 to Chapter 13 was in bad faith.

### 3.   How the Debtor's Actions Affected Creditors and Their Treatment.

The fifth and sixth *Gier* factors are "how the debtor's actions affected creditors" and "the debtor's treatment of creditors both before and after the petition was filed." Again, the Court sees no bad faith.  Most of the Debtor's debt is typical consumer debt: a car loan; some delinquent taxes; and credit card debt.  In Chapter 13, the Debtor proposes to pay most of such debt.  With respect to the Debtor's most significant creditors (Hard Hat and Kokanee Investments), the Debtor disputes that he owes any debt to them.  Hard Hat Proof of Claim No. 11-1 already has been disallowed.  (This is a positive development in Chapter 13 for the Debtor and other creditors.)  And, the Debtor has objected to Kokanee Investments Proof of Claim No. 16-1.  Nothing about the Debtor's actions mandates that the Chapter 13 reorganization must be reconverted to Chapter 7 liquidation.

### 4.   Whether the Debtor Has Been Forthcoming with the Bankruptcy Court and the Creditors.

The seventh *Gier* factor is "whether the debtor has been forthcoming with the bankruptcy court and the creditors."  The Court (like the Chapter 13 Trustee) is concerned about the Debtor's disclosures throughout his bankruptcy case.  On his initial Statement of Financial Affairs and Schedules (filed on the Petition Date), the Debtor did not identify his transfer of the Wyoming Property to his son on September 15, 2022 (about six months before the Petition Date).  The Chapter 7 trustee conducted a Section 341 meeting of creditors on April 12, 2023.  The Court did not receive testimony concerning what happened at the Section 341 meeting.  However, the Court surmises that the topic of the transfer of the Wyoming Property surfaced.  Presumably as a result, the Debtor amended Section 18 of his Statement of Financial Affairs a few days later (April 19, 2023) and identified the transfer of the Wyoming Property.  He disclosed that he transferred "Wyoming properties, [with a value of] $141,404" to his son, "Andrew Plese, 208 Railway Street, Hawk Springs, Wyoming" on September 15, 2022.  The Debtor indicated that the property value ($141,404.00) was derived from the "assessed value per Goshen County Assessor."  With respect to "any property or payments received or debts paid in exchange" for the transfer, the Debtor stated: "$0 (son paid for & lives at property)."  Plainly, this disclosure should have been made from the get-go on the Petition Date.  The Debtor did not have a very good explanation for the initial nondisclosure.  He testified that it was "a mistake" and he "should have asked better questions" (presumably of his counsel in the preparation of the initial Statement of Financial Affairs).  The implication is that the Debtor never really considered the Wyoming Property to be his since he did not pay for it.  The Court views the foregoing initial nondisclosure with a very jaundiced eye.  However, it is not particularly unusual

for Debtors to file initial Statements of Financial Affairs and Schedules with errors which are later corrected by amendments.

The Court also is concerned with the Debtor's disclosures concerning income and expenses on Schedules I and J. The Debtor filed three subsequent amendments to Schedules I and J because of asserted "corrections" and "updates." The changes were material. The Debtor's initial Schedule J showed negative monthly net income; so Chapter 13 would not have been a realistic option. The monthly net income on the Debtor's three subsequent amendments of Schedule J did not change much ($565.00, $510.00, and $564.30); however, the income and expenses ping-ponged back and forth changed a lot. The Court finds these important financial disclosures quite suspect. However, the Court recognizes that the Debtor's income from Plese Electric is highly variable. And, perhaps most importantly, the Debtor has been paying the proposed $564.60 plan payments to the Chapter 13 Trustee for approximately 9 months. (The Chapter 13 Trustee has not requested conversion or dismissal on the basis of any alleged delinquency in payments.)

Finally, the Court also is concerned with the Debtor's confusing and sometimes contradictory disclosures and testimony regarding his residence and the circumstances of the transfer of the Wyoming Property to his son. In his Petition, the Debtor identified his residence as 1980 Carrol Court, Thornton, Colorado. However, on approximately eleven documents introduced into evidence, the Debtor identified his address as the Wyoming Property. Perhaps the Debtor spent some time at both locations. However, the discrepancies were not satisfactorily explained. With respect to the transfer of the Wyoming Property and execution of the Transfer Deed on September 15, 2022, the Court found the Debtor's testimony confusing and sometimes contradictory. Although it is not the Court's role to make a final determination about a potential fraudulent transfer claim when deciding the Reconversion Motion, the parties introduced a lot of evidence about the topic. And, at the end of it all, the Court cannot draw any conclusions on the issue. The most that can be said is that the Debtor's execution of the Transfer Deed possibly might be avoided as a fraudulent transfer, or not. In any event, given all the foregoing, the Court assesses that the seventh *Gier* factor weighs in favor of reconversion from Chapter 13 reorganization to Chapter 7 liquidation.

### 5.    Conclusion regarding Dismissal Under Section 1307(c).

Based on the foregoing, the *Gier* factors are mixed. Most of the factors do not point toward the necessity of reconversion. However, one factor does. Under such circumstances, the Court reorients itself back to the "totality of the circumstances" and whether there has been "an abuse of the provisions, purpose, or spirit of [Chapter 13]." After all is said and done, it is a close call. However, the Court concludes in the exercise of its discretion, that the Chapter 13 Trustee failed to meet his burden to establish cause for reconversion under Section 1307(c). The Chapter 13 Trustee's central complaint is about the transfer of the Wyoming Property. The Debtor waited about a month after the Petition Date to make disclosure about the September 15, 2022 transfer of the Wyoming Property to his son. However, the transfer is now of record. The Chapter 13 Trustee apparently prefers that a Chapter 7 trustee investigate and

potentially bring a fraudulent transfer claim against the Debtor's son.  But, standing alone, that is not a reason for reconversion.  The Chapter 13 Trustee may pursue such claim if factually and legally warranted.  And, meanwhile, the Debtor has filed a series of Chapter 13 plans.  In the Third, Fourth, and Fifth Chapter 13 Plans, the Debtor proposes to make 36 monthly payments of $564.60 for a total of $20,325.60 to the Chapter 13 Trustee.  This appears to be all of the Debtor's projected disposable income; and it is not *de minimus*.  Somehow, the Debtor is making the payments (at least so far).  So, Chapter 13 might be the most favorable mechanism for creditors to receive the highest payments.  Under such circumstances, the Court is not convinced that the Debtor is abusing the provisions, purpose, or spirit of Chapter 13.

## VI.    Conclusion and Order

For the foregoing reasons, the Court DENIES that Reconversion Motion.  The Debtor may continue to pursue confirmation of the Fifth Chapter 13 Plan.

DATED this 17th day of April, 2024.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge